UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald J. PIMENTEL,
Defendant-Appellant.

No. 80–1350.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 10, 1981.

Rehearing and Rehearing En Banc
Denied Aug. 28, 1981.

Decided June 15, 1981.

Ronald J. Pimentel, in pro per.

Roger Hurt, Oakland, Cal., for defendant-appellant.

John E. Burns, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before WALLACE and NORRIS, Circuit Judges, and GRANT,* District Judge.

* Honorable Robert A. Grant, United States District Judge, Northern District of Indiana, sitting by designation.

WALLACE, Circuit Judge.

Pimentel was convicted on two counts of wiretapping pursuant to 18 U.S.C. §§ 2511 and 2512. We conclude that none of the several issues he raises on appeal have merit and we affirm.

I

Pimentel was an employee of Roper Investigations, a private investigation firm. Pimentel's co-defendant at trial was John Kenneth Roper, the president of Roper Investigations. Blue Star Meat Company of San Leandro, California, hired Roper Investigations to investigate suspicions that certain Blue Star employees were involved in kickback schemes. Pimentel and another Roper employee, David Webb, installed a monitoring device and tape recorder on the business phones of Blue Star in order to monitor the conversations of employees. The employees were unaware of the monitoring of their phone calls, and never consented to such monitoring. There was apparently no discussion between Blue Star and any Roper employee concerning the legality of the installation of the monitoring devices. Several months after the installation of the equipment, Pimentel informed the president of Blue Star that there was a problem with some of the equipment, and that there might be an investigation. Subsequently, the equipment was disconnected and removed.

Another client of Roper's was the Big B Lumberteria in Oakland. The management at Big B suspected that certain of its employees were engaged in the theft and sale of Big B's lumber. Initially, Pimentel suggested that he and other Roper employees should pose as customers and attempt to induce Big B employees to engage in illicit sales. After this program proved unsuccessful, Pimentel suggested monitoring the yard employees' phone line. Pimentel assured the Big B management that such monitoring would be legal. To support this view, he produced a newspaper article re-

porting a district court case. The Big B management was apparently convinced of the legality of the monitoring operation. According to Pimentel's apparent understanding of the law, a Big B employee had to make the final connection of the wiretap device to make the installation legal. This was done. The Big B employees were unaware that the phone had been tapped, and never consented to having their calls monitored. The monitoring operation produced results. A taped conversation indicated that a theft was about to occur. The tape was brought to the attention of the Oakland Police Department. An attempted theft did, in fact, occur with the police present. Four persons were arrested.

The FBI began to investigate the wiretaps at Blue Star and Big B. It was the threat of this investigation that caused Pimentel to suggest the removal of the wiretap equipment from Blue Star. In addition, the FBI subpoenaed Roper Investigations' files and records concerning its activities with Blue Star and Big B. Pimentel suggested to Big B employees, after the FBI had inquired about wiretaps there, that they not talk to the FBI about the wiretaps. Further, one of the Big B employees testified that despite Pimentel's initial assurances that the wiretaps were legal, Pimentel had subsequently stated that the monitoring of the conversations was not "kosher."

Pimentel and John Kenneth Roper were indicted for their wiretapping activities at Blue Star and Big B. Webb cooperated with the FBI, and apparently has not been indicted for his part in the wiretap activities. The jury found both defendants guilty.

## II

Pimentel argues that he was deprived of three of the ten peremptory juror challenges to which he is entitled under Rule 24(b) of the Federal Rules of Criminal Procedure. He contends that the application to him of Local Rule 326–1 of the Northern District of California violates his Sixth Amendment right to a fair trial, as explained by our opinion in *United States v. Turner*, 558 F.2d 535 (9th Cir. 1977).

Pimentel's reading of *Turner* as having a constitutional basis is erroneous. In *Turner*, we stated:

> Neither the number of peremptory challenges nor the manner of their exercise is constitutionally secured . . ., but the peremptory challenge is "one of the most important rights secured to the accused."

*Id.* at 538 (citations omitted), *quoting Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 29, 63 L.Ed. 1154 (1919).

Local Rule 326–1 provides for the alternating of peremptory challenges between the government and the defense.[1] It further provides that if either party passes a peremptory challenge, that challenge is waived. In Pimentel's trial, the defense exercised only one of the two challenges to which it was entitled in round two, and in round three passed both of the challenges to which it was entitled. Thereafter, the defense exercised all its remaining peremptories. Although it is not clear from the record whether Pimentel attempted to use the three peremptories that he passed at the close of the Local Rule 326–1 procedure, he complains that he was denied the use of those three peremptories in violation of *United States v. Turner, supra.*

1. Local Rule 326–1 of the Northern District of California provides in part:

Except where the judge has directed . . . that a different procedure shall be followed, peremptory challenges to which each party may be entitled under Rule 24(b), Federal Rules of Criminal Procedure, shall be exercised in the following manner: the first by the government, the second by the defense, the next by the government, the next two by the defense, the next by the government, the

next two by the defense, the next by the government, the next two by the defense, the next by the government, the next two by the defense, the next by the government, and the last by the defense.

If either party passes a peremptory challenge, such pass shall be treated as though that challenge had been exercised but shall not constitute a waiver of subsequent challenges to the jurors, including those empanelled prior to the pass.

In *Turner*, the defendant and his two co-defendants agreed that each would be able to use three of the ten peremptories allotted them under Rule 24(b), and that the final challenge would be exercised jointly. During the voir dire, Turner passed three times and accepted the jury panel as then constituted. After one of Turner's co-defendants exercised one of his peremptories, Turner attempted to use a peremptory challenge to excuse the new member of the panel. The district court refused to permit Turner to exercise a peremptory challenge, holding that Turner had used all of his peremptories by his three passes. We reversed. We held that the method chosen by the district court must not unreasonably restrict the defendant's use of his challenges, and that the district court must give adequate notice of the peremptory challenge system to be used. We also stated, by way of dicta, that a defendant's pass of a peremptory challenge cannot be deemed a waiver of challenges to jurors who have not yet been placed on the panel. *Id.* at 538.

█ Because this case is distinguishable from *Turner*, we need not decide whether we will adhere to the dicta in *Turner*. Under the local rule procedure used by the district judge, Pimentel had the opportunity to exercise a peremptory challenge to each juror selected after government strikes.[2] This is all the dicta in *Turner* requires. We said in *Turner*:

> We are not confronted with a claim that a defendant can save his challenges, after he has accepted a panel, and then use them to challenge members of the same panel after other defendants or the Government has exhausted their chal-

lenges.... The issue is much narrower: Can the defendant be forced to forego a peremptory challenge each time he accepts a panel as then constituted? Our negative answer does not mean that a defendant can challenge a member of the panel that he has accepted. It means that acceptance of a panel cannot be deemed a waiver of a peremptory challenge in respect of a person who was not a member of the panel at the time the jury was accepted.... Our holding does not prevent a district judge from forbidding a challenge to any juror who was a member of the panel at the time the jury was accepted.

*Id.* (footnote and citations omitted). Because Pimentel had the opportunity to challenge every juror put in the box subsequent to government strikes and, in fact, to challenge jurors in the box prior to his passes, the system used by the district judge pursuant to the local rule was fundamentally fair and consistent with the dicta in *United States v. Turner*. Thus, Pimentel cannot complain that he did not have the opportunity to strike jurors named to the panel before he passed. The local rule is, then, less restrictive than *Turner* in that it permits challenges to jurors empanelled prior to the defendant's pass. *See also United States v. Anderson*, 562 F.2d 394, 396–97 (6th Cir. 1977); *United States v. Mackey*, 345 F.2d 499, 502–03 (7th Cir.), *cert. denied*, 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965).

### III

Pimentel contends that the trial judge's voir dire was perfunctory and deprived him

2. The record reflects only which jurors were struck and when they were struck, not which side struck them. If we accept Pimentel's representations, we can piece together which side exercised which challenges. Pimentel claims that the defense passed one of its two challenges in round two and both of its challenges in round three. He further claims that the defense used all of the rest of its challenges. There is nothing to indicate that the government passed any of its initial challenges. There were a total of ten jurors struck. Thus, seven of those strikes would have been defense strikes, and three would have been government strikes. The government must have used its

three strikes in the first three rounds because there were sufficient total strikes in each of those rounds to account for the number of defense strikes that Pimentel claims were made in those rounds if the government made one strike in each of those rounds. In the fourth round, the round following the last of the defense passes, one member of the original panel was struck and one member that had been added following the second round was struck. Both of these panel members were, of course, on the panel when the defense passed both of its challenges in the third round. None of the strikes in rounds after the fourth round were as to jurors on the panel before the fourth round.

of a fair trial because the trial judge failed to explore adequately the possibility that the jurors had preconceived notions about the legality of wiretapping. Pimentel also contends that the district judge erred in refusing to grant Pimentel a new trial on the basis of affidavits submitted by jurors after the trial to the effect that some jurors did in fact have prejudicial attitudes concerning wiretapping.

 In reviewing the conduct of voir dire by the district judge, we will not reverse unless the procedures used or the questions asked were so unreasonable as to constitute an abuse of discretion. *United States v. Rosales-Lopez*, 617 F.2d 1349, 1353 (9th Cir. 1980), *aff'd*, —— U.S. ——, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). The district judge conducted voir dire himself, pursuant to Rule 24(a) of the Federal Rules of Criminal Procedure and Local Rule 326.1. Pimentel complains that the district judge failed to ask some of Pimentel's proposed questions, which were designed to probe the jurors' attitudes on the issue of wiretapping. The district judge did, however, ask questions concerning wiretapping to the entire group of prospective jurors. He asked, "Have you any preconceived ideas or notions or feelings about the federal wiretap laws? . . . Have you any preconceived notions about them or any prejudices one way or another?" There was no response to these questions. Subsequently, as the jurors were put in the jury box, the district judge asked each of them whether they had any response to the questions already asked of the entire group, or whether they could render a verdict solely on the evidence presented at trial and the instructions of law given by the judge. None of the jurors indicated any problems. We conclude that the use of this procedure was not an abuse of discretion. *United States v. Giese*, 597 F.2d 1170, 1182 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).

Immediately prior to Pimentel's sentencing, Pimentel and Roper moved for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, alleging that post-trial conversations with some of the jurors indicated that some jurors had made up their minds about the guilt of the defendants before the court instructed them on the law. Pimentel asserts that this shows that some of the jurors believed that all wiretapping was illegal, and that they failed to consider Pimentel's primary defense, lack of intent. He argues that a proper voir dire would have uncovered these attitudes, permitting jurors to be struck for cause or to be challenged peremptorily. The evidence in support of these allegations is an affidavit by Roper's counsel recounting his conversations with some of the jurors, and a declaration filed by one of the jurors personally.

 The district judge properly refused to consider this offer. Testimony of a juror concerning the motives of individual jurors and conduct during deliberation is not admissible. Juror testimony is admissible only concerning facts bearing on extraneous influences on the deliberation, in the sense of overt acts of jury tampering. *Mattox v. United States*, 146 U.S. 140, 148–49, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892); Fed.R.Evid. 606(b).

## IV

Pimentel next complains of two different incidents of prosecutorial misconduct. He alleges that the Assistant United States Attorney who tried the case made improper statements during closing argument, and that the prosecutor improperly prejudiced Pimentel by changing the order of the trials on the separate counts of the original eight-count indictment.

### A.

Pimentel points to several parts of the prosecutor's closing argument that he claims were improper, but only one of these claims is not frivolous. Pimentel contends that the prosecutor commented, in the rebuttal portion of his closing argument, on Pimentel's failure to testify on his own behalf, and implied that Pimentel had some burden of producing evidence.

The prosecutor's statement is not an explicit comment on Pimentel's failure to testify. Pimentel argues, however, that the prosecutor's statement, "you have a right to ask for that evidence—" prejudiced him by suggesting to the jury that Pimentel had some burden of production of evidence and that he had some duty to testify.[3] On review of such a claim, we have before us "only the cold print of the record . . . ." *Orebo v. United States*, 293 F.2d 747, 749 (9th Cir. 1961), *cert. denied*, 368 U.S. 958, 82 S.Ct. 402, 7 L.Ed.2d 389 (1962). We must therefore give considerable weight to the determination of the trial judge, "who saw and heard the actual events, and found no prejudice." *Id.*

The district judge, to his credit, provided a specific interpretation on the record of what he saw and heard. In responding to the defendants' motions for a mistrial at the time the statement was made, the district judge said that he had not interpreted the prosecutor's statement as a call for evidence from the defendants or as a comment on the failure of the defendants to testify. Rather, he observed that the prosecutor had not used the word "burden," and had not said that the defendant had to come forward with anything. The district judge stated that he interpreted the statement merely as an attempt to underscore the significance of certain evidence compared to other evidence. Subsequently, the district judge reviewed the court reporter's transcript of the prosecutor's statement. He observed that the "cold print" seemed worse than the statement had sounded when it was made. The district judge adhered to his ruling denying a mistrial, however, because the statement, in context, "would not lend itself to a clear invitation to a jury to hold the defense responsible for not producing evidence . . . ."

The district judge stated the proper standard of law for determining whether the comments were improper. The comments of a prosecutor must be such "that the jury would naturally and necessarily take them to be comments on the failure of the accused to testify . . . ." *United States v. Cornfeld*, 563 F.2d 967, 971 (9th Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). Further, the district judge's interpretation of the facts is certainly supported by the record. The context in which the prosecutor made his statement was in response to arguments made by defense counsel. He was arguing that there was no evidence to support many of the assertions that defense counsel had made in his closing argument. A fair reading of the statement is that the jury need

3. The prosecutor's argument leading up to the controversial statement is as follows:

Ladies and gentlemen, as you have heard the government witnesses are pillars of justice, implying that perhaps this is a setup. You heard that perhaps agent Johnson is lying when he admitted on the stand that he made a mistake when he made out that 302 about the cash disbursements journal. Another red herring. But perhaps agent Johnson and agent Moulton, in their exuberance for their jobs, have colored their testimony. And that perhaps Mr. Johnson was not quite truthful on the stand. And then the discussion about Mr. Moulton that due to the fact that he is in the FBI and works for the government, he has a motive and he would take the oath, get on the stand and color his testimony. Ladies and gentlemen, those accusations are easy to make, but they are serious accusations. And you, as jurors, have a right to demand evidence of that kind of accusation.

We submit there is no evidence, merely name-calling. That is all it is. Again, a set-up by the collusion of the government witnesses, including, at this time, the credibility of the investigation. Does that jibe with your common sense, ladies and gentlemen? Does it make sense? Is it in the evidence in the case or again is it a red herring?

Counsel discussed in his argument something about neighbors; talked about vast and big agencies; talked about jury trial; talked about television programs; talked about surveillance. Does that go to the essence or the heart of this case as to whether his clients knew what he was doing was wrong or not? Does it go to the heart of the case or does it try to deflect you from it, go to something else other than the evidence which was submitted that shows you unequivocally the truth.

Did he ask you to speculate and guess? Maybe there came a time when something went wrong. Possibly it happened here, possibly not. Ladies and gentlemen, you have a right to ask for that evidence—

not consider the arguments made by defense counsel that were not supported by evidence in the record. This is apparently the interpretation made by the district judge, and we see no reason to overturn his determination.

### B.

Pimentel's next accusation of prosecutorial misconduct is that the prosecutor improperly sought a change in the order of Pimentel's trials, thereby subjecting Pimentel to cross-examination in the first trial for the alleged perjury he committed during the course of the transactions underlying the criminal acts alleged in the second trial. The original indictment against Pimentel and Roper contained eight counts. Counts One through Four charged only Roper with mail fraud in violation of 18 U.S.C. §§ 1341–42. These counts alleged a scheme to defraud insurance companies under Roper's insurance policies against the loss of personal property. Counts Five and Six charged both Roper and Pimentel with mail fraud, and alleged that the defendants devised a scheme to defraud insurance companies on worker's compensation claims. The gist of the alleged scheme was that Pimentel submitted a worker's compensation claim through Roper that stated that injuries that Pimentel had suffered off the job had in fact been suffered on the job. Counts Seven and Eight are the wiretapping charges that are the subjects of the case before us.

Pimentel moved for severance of these counts pursuant to Rule 8(a) of the Federal Rules of Criminal Procedure. The district judge granted Pimentel's motion because the indictment alleged three unrelated crimes, which had to be severed pursuant to Rule 8(a). He set the trial for Counts Five and Six first, followed by the trial on Counts Seven and Eight, and then the trial on Counts One through Four.

Subsequently, the prosecutor requested that Counts Seven and Eight be tried first. He gave as his reason the desire for judicial economy, stating that if the defendants were found guilty on Counts Seven and Eight, there might not be a trial on Counts Five and Six, but that the converse was not necessarily true. Roper objected on the ground that the prosecutor's reason for his request was that his evidence on Counts Five and Six was weak, and that he would want to try the stronger case first. Roper's attorney suggested that the prosecutor should dismiss Counts Five and Six with prejudice. The prosecutor denied that the strength of the evidence was a motive for his seeking a new order of trials. The court granted a dismissal without prejudice on Counts Five and Six, and set the trial on Counts Seven and Eight to go first. Neither defendant raised at that time the possible impeachment by the use of allegedly false statements connected with the worker's compensation claims that were the subject of Counts Five and Six in the trial on Counts Seven and Eight.

During the course of the trial on Counts Seven and Eight, it became known to defense counsel that the prosecutor intended to use the allegedly false statements to impeach Pimentel if he took the stand. Pimentel requested that either the prosecutor should be barred from using the allegedly false statements or he should be required to dismiss Counts Five and Six with prejudice thus alleviating Pimentel's self-incrimination problems. The district judge refused these requests, stating that any sworn statement could be used to impeach a defendant's credibility on cross-examination. Relying on *United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), the district judge held that when a defendant takes the stand, he places his credibility in issue, and that his credibility could be impeached with a prior sworn statement, pursuant to Rule 608 of the Federal Rules of Evidence. The district judge considered it irrelevant that the statement used for impeachment purposes might have some bearing on some other pending criminal case.

■ As a matter of law, the district judge's ruling was correct. He properly interpreted *United States v. Hearst, supra.*

The Fifth Amendment does not shield a criminal defendant who takes the stand in his own defense from cross-examination or from impeachment of his credibility by use of prior false statements. To the extent that Pimentel argues that the district judge ruled incorrectly on the Fifth Amendment question, his argument is without merit.

Pimentel's argument, however, goes somewhat beyond this. He argues that the prosecutor improperly and purposely reversed the order of the trials to prevent Pimentel from taking the stand in his own defense in the trial of Counts Seven and Eight. He further alleges that because of the prejudice to Pimentel from the use of the false statement to impeach him in the trial of Counts Seven and Eight, the order of the trials was a violation of Rule 14 of the Federal Rules of Criminal Procedure, which prevents prejudicial joinder.

■ Although the order of the trials put Pimentel in an unfortunate position, which could have been avoided if the trials had been held in the opposite order, we find no error in holding the trial of Counts Seven and Eight first. Pimentel has pointed to nothing in the record to suggest that the prosecutor acted with the claimed intent to prejudice Pimentel. The prosecutor's stated reason for changing the order of the trials, judicial economy, appears reasonable from the record. There is no rule that a prosecutor must prosecute cases in the order that most benefits the defendant. There is nothing in this record upon which Pimentel can successfully claim prosecutorial misconduct.

Rule 14 is not involved in this case. It pertains to relief from prejudicial joinder, and has nothing to do with the order of trials. Severance was granted pursuant to Rule 8, not Rule 14. The only prejudice alleged in the motion for severance was the inherent prejudice of requiring a defendant to stand trial on unrelated counts. There was nothing in the motion or in any of the discussions surrounding it to suggest that there would be any prejudice in the use of information from one trial to impeach the defendants in the other. Moreover, if the indictments had been brought separately at the start, Pimentel would have no argument that Rule 14 compelled a particular order of trials. Thus, Pimentel's argument that Rule 14 required the district judge either to deny the prosecutor the opportunity to impeach Pimentel or to dismiss Counts Five and Six with prejudice is totally without merit.

Viewing Pimentel's allegations of prosecutorial misconduct individually and as a whole, we are unable to say that the prosecutor was guilty of misconduct in this case.

## V

Pimentel's final contention is that the district judge abused his discretion in failing to grant Pimentel's motion for a new trial. Pimentel contends that there was insufficient evidence on the issue of criminal intent to support a conviction. Pimentel's primary defense at trial had been that his conduct was not willful because he believed that he was acting within the law. The district judge instructed the jury that an error of law, a mistake of fact, or the exercise of bad judgment would negate the statutory requirement of a willful state of mind. Pimentel contends that his actions were the result of a good faith belief that what he was doing was legal.

■ A motion for a new trial is directed to the discretion of the district judge. It should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." 2 Wright, Federal Practice and Procedure, Criminal § 553 at 487 (1969). Far from finding that the evidence preponderated heavily against the verdict, the district judge commented that, viewing the evidence in the light most favorable to the government after the verdict, the case on the issue of criminal intent as to both defendants was "devastating." In reviewing the record, we cannot say that the district judge abused his discretion in failing to grant a new trial. There is adequate evidence to show that Pimentel knew that he was engaging in illegal wiretapping.

AFFIRMED.