**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

HORACIO YEPIZ, AKA Little Horse,
AKA Alberto Rodriguez, AKA
Seal C,
            *Defendant-Appellant.*

No. 09-50574

D.C. No.
2:05-cr-00578-
JFW-3

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
November 16, 2011—Pasadena, California

Filed July 2, 2012

Before: William A. Fletcher and Johnnie B. Rawlinson,
Circuit Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge Rawlinson

---

*The Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

7777

**COUNSEL**

Benjamin L. Coleman, Coleman & Balogh LLP, San Diego, California for appellant Horacio Yepiz.

Nili T. Moghaddam, Assistant United States Attorney, Los Angeles, California, for appellee United States.

## OPINION

RAWLINSON, Circuit Judge:

One of the most valuable weapons in the arsenal of the trial attorney is the peremptory challenge. In a criminal trial, availability of this weapon is ensured pursuant to Rule 24 of the Federal Rules of Criminal Procedure. Specifically, Rule 24 provides that in a non-capital felony case, the prosecution is allowed six peremptory challenges and the defense is allowed ten peremptory challenges.[1]

Appellant Horacio Yepiz (Yepiz) was tried and convicted of racketeering and violence in aid of a racketeering enterprise. Although Yepiz was entitled to exercise ten peremptory challenges, he was unable to do so because of a "use it or lose it" voir dire practice followed by the district court. This practice impermissibly deprived Yepiz of two of the peremptory challenges to which he was entitled. *See United States v. Turner*, 558 F.2d 535, 538 (9th Cir. 1977) (explaining that the defense cannot be forced to lose a peremptory challenge each time it accepts a jury panel as then constituted). We affirm the convictions, however, under a plain error standard of review. The error by the district court, although plain, and affecting Yepiz's substantial rights, did not "seriously affect[ ] the fairness, integrity, or public reputation" of the voir dire proceedings. *United States v. Lindsey*, 634 F.3d 541, 550-51 (9th Cir.

---

[1] The text of Fed. R. Crim. P. 24(b) reads in pertinent part:

Peremptory Challenges. Each side is entitled to the number of peremptory challenges to prospective jurors specified below. . . .

(1) Capital Case. Each side has 20 peremptory challenges when the government seeks the death penalty.

(2) Other Felony Case. The government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges when the defendant is charged with a crime punishable by imprisonment of more than one year.

2011) (applying plain error review to similar facts and clarifying that relief should be granted only if the plain error seriously affected the judicial proceedings).[2]

## I.  *BACKGROUND*

### A.   Indictment

A second superseding indictment alleged that Yepiz was a member of the Vineland Boys Gang (VBS), "one of the most violent street gangs in the San Fernando Valley. . . ." "The VBS Gang control[led] drug distribution and other illegal activities within the Sun Valley area of Los Angeles. . . ." The VBS "partnered with various Mexican national drug trafficking organizations in the VBS area. In return for a steady supply of low-priced narcotics, the VBS allow[ed] these Mexican national organizations to operate within VBS territory and provide[d] these organizations with protection from other drug traffickers and gang members. . . ."

Count One alleged that Yepiz and other members of the VBS participated in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The indictment alleged that, "[b]eginning on a date unknown to the Grand Jury and continuing to on or about November 30, 2005," Yepiz conspired "[t]o distribute at least five kilograms . . . of cocaine. . ." According to the indictment, "[o]n or about October 13, 1992," Yepiz also "knowingly and intentionally possessed with intent to distribute approximately 50 grams of . . . cocaine . . ." and "[o]n or before July 27, 1999," Yepiz "knowingly and intentionally possessed with intent to distribute more than 500 grams . . . of cocaine . . ." Additionally, "[o]n or about August 12, 2003," Yepiz participated in the murder of Eugenio Cruz.

---

[2]Yepiz raised other issues, which are addressed in a memorandum disposition filed contemporaneously with this opinion.

Count Two alleged that Yepiz, as a member of the VBS, engaged in drug trafficking and racketeering conspiracies in violation of 18 U.S.C. § 1962. According to the indictment, Yepiz and his co-conspirators "direct[d] other VBS members in their drug trafficking and racketeering activities," "acquire[d] large quantities of cocaine, methamphetamine, and marijuana from Mexican national drug trafficking organizations on behalf of the VBS," and "distribute[d] large quantities of cocaine, methamphetamine, and marijuana on behalf of the VBS."

Count Two also alleged that Yepiz and a co-conspirator traveled to Kentucky to distribute cocaine, and, "[o]n July 28, 1999, while in Kentucky," Yepiz "possessed approximately three kilograms of cocaine." Additionally, "[o]n July 31, 1999, while in Kentucky, [Yepiz] . . . possessed approximately two kilograms of cocaine and approximately $17,500 in proceeds from the sale of cocaine."

According to Count Two, Yepiz "contacted a member of the Mexican Mafia at Pelican Bay State Prison and requested permission to kill [Eugenio Cruz] and take over the VBS gang." "Prior to June 2003, [Yepiz] told unindicted co-conspirators that he had permission from a member of the Mexican Mafia to kill [Eugenio Cruz]." In approximately June 2003, [Yepiz] met with representatives of the Mexican Mafia in order to discuss [Yepiz's] attempts to take over VBS and his threats to kill [Eugenio Cruz]." "On August 12, 2003 . . . [Yepiz] shot [Eugenio Cruz] in the head twice."

Count Three alleged that Yepiz and his co-conspirators conspired to distribute cocaine, cocaine base, methamphetamine, and marijuana in violation of 21 U.S.C. §§ 841 & 846. According to Count Three, Yepiz met with members of the Mexican Mafia regarding the gang's drug trafficking, and Yepiz traveled to Kentucky with a co-conspirator to distribute cocaine.

Count Five alleged that Yepiz committed a violent crime in aid of racketeering in violation of 18 U.S.C. § 1959 by participating in Eugenio Cruz's murder so as to enhance Yepiz's position in the VBS gang.

Count Twenty-Four alleged that Yepiz "used and carried a firearm, during and in relation to a crime of violence, namely Violent Crime in Aid of Racketeering . . . as alleged in Count Five . . ."[3]

## B. Voir Dire Proceedings

For voir dire, the government had six peremptory challenges and the defense had ten, as provided in Rule 24 of the Federal Rules of Criminal Procedure. Prior to the beginning of the jury voir dire, the district court instructed the parties that it utilized "a use or lose it policy on passing or accepting the jury." Under this practice, acceptance of a jury panel as constituted at any point during the voir dire proceedings would be counted as the use of a peremptory challenge.

The defense exercised eight peremptory challenges, and accepted two jury panels as then constituted. Under the district court's "use it or lose it" practice, the defense "waived" two peremptory challenges based on acceptance of the two jury panels as then constituted. As a result, the defense could not exercise a peremptory challenge for any prospective juror who was seated after the actual exercise of his eighth peremptory challenge. This "use it or lose it" jury selection practice deprived Yepiz of two peremptory challenges to which he was otherwise entitled under Fed. R. Crim. P. 24.

After the government exercised its final peremptory challenge, a prospective juror was called who stated that she had a law degree but had not practiced law. The prospective juror

---

[3]The remaining counts of the indictment contained no allegations concerning Yepiz.

had worked for ten years with her husband, an attorney, in his estate planning business. She also assisted her husband in his personal injury, business litigation, and criminal defense practice. According to the prospective juror, she attended law school from 1994 to 1997, and interned at the District Attorney's Office for six months. The prospective juror informed the court that, during her internship, she worked on juvenile cases, but was not personally involved in any cases dealing with gang members. She stated that her work at the District Attorney's office and in her husband's legal practice would not affect her impartiality and that she could follow the district court's instructions. At this point in the jury selection process, the defense had used its eighth and final peremptory challenge under the court's "use it or lose it" policy. Because there were no remaining peremptory challenges under the court's "use it or lose it" voir dire policy, and because the parties did not challenge the juror for cause, she was seated as the final member of the jury.

## C.  Trial Testimony and Verdict

Victor Bugarian (Bugarian) testified that he was arrested in 2004 for selling methamphetamine and had agreed to cooperate with law enforcement. Bugarian controlled the drug trade in part of the San Fernando Valley from approximately 2000 to 2003, on behalf of the Mexican Mafia, a prison gang. Bugarian worked under the supervision of Mexican Mafia member Ricky Cruz.

Bugarian related that the VBS was subject to a "greenlight," which meant the gang was targeted for physical violence from other gangs, because it did not cooperate with the Mexican Mafia. However, Bugarian reached an agreement with the VBS leader, Eugenio Cruz, for the VBS to pay $2,000 a month and purchase their narcotics from the Mexican Mafia.

Bugarian testified that he met with Yepiz in 2003 about a letter from Ricky Cruz giving Yepiz permission to kill

Eugenio Cruz. During a meeting at Eugenio Cruz's home, Bugarian destroyed the letter, and it was agreed that Yepiz would no longer write letters to the Pelican Bay state prison. According to Bugarian, Eugenio Cruz was murdered a couple weeks after the meeting.

Gustavo Rodriguez (Rodriguez) testified that on the day Eugenio Cruz was killed, he agreed to give Yepiz a ride in Rodriguez's vehicle after leaving a gas station with Eugenio Cruz. According to Rodriguez, Eugenio Cruz sat in the front passenger seat. When Yepiz entered the vehicle, he took the rear passenger seat. Shortly afterwards, Rodriguez "heard two shots ring out," and saw Yepiz exit the vehicle while it was still moving. Yepiz entered his own vehicle, which was parked nearby, and drove away. Noticing that Eugenio Cruz's head was bleeding, Rodriguez pushed Eugenio Cruz's body from the car and "race[d] out of the area."

Rodriguez immediately called Yepiz's brother, Ralph, who "told [Rodriguez] just to be quiet and go to [Ralph's and Yepiz's] brother's house — Manuel's house." At Manuel's house, Rodriguez cleaned the blood from his car and drove it to a place to hide it. Rodriguez eventually dismantled his car because "there was . . . blood splattered all over the place."

Prior to Eugenio Cruz's death, Rodriguez attended a meeting with Yepiz and "a representative for a member of the Mexican Mafia" to discuss letters that Yepiz had written to a member of the Mexican Mafia about Eugenio Cruz. According to Rodriguez, Yepiz "was instructed to leave the matter alone."

On cross-examination, Rodriguez confirmed that, after he was arrested, he told the police that he did not know anything about Eugenio Cruz's death, and that he "had no idea what happened to [Eugenio Cruz]."

Anthony Ascencio (Ascencio) testified that he was a member of the VBS, and that Yepiz sold drugs for the gang during

the time that Eugenio Cruz was the VBS' leader. Ascencio related that he purchased drugs from Yepiz in the early 1990s.

According to Ascencio, the gang was concerned about the conflict between Yepiz and Eugenio Cruz, and a meeting was held to discuss letters that Yepiz was sending to the Mexican Mafia. Ascencio related that the conflict between Eugenio Cruz and Yepiz concerned Eugenio Cruz's leadership of the gang.

Ascencio also testified that Rodriguez told Ascencio "about a week after [Eugenio Cruz] was killed" that Rodriguez was present at Eugenio Cruz's murder. According to Ascencio, Rodriguez stated that Yepiz had murdered Eugenio Cruz.

Detective David Torres of the Los Angeles Police Department testified that he investigated the VBS in 2004, and seized forty-eight kilograms of cocaine, fifty pounds of methamphetamine, and three hundred pounds of marijuana.

During the investigation, Detective Torres identified Yepiz as using the nickname "Horse." Detective Torres testified that a wiretap revealed Yepiz was requested to assist with a problem the gang was having in Mexico. Detective Torres also testified that, in an October 25, 2004, phone call, Espiridion Aranda and Gustavo Aranda referred to "Horse" or "Big Body" as being involved in a drug transaction.

Detective Timothy McConnell of the Louisville, Kentucky, Police Department testified that, on July 31, 1999, he responded to a call concerning a suspicious bag located in a room at a Super 8 Motel. Detective McConnell "opened the bag up and saw a white powder substance, along with a lot of currency." According to Detective McConnell, the hotel clerk informed him that the room was registered to "Espinoza" Aranda.

After detaining Espinoza Aranda, Detective McConnell searched him and found a piece of paper with a Red Roof Inn

room number "that was just up the street from the Super 8 Motel." Detective McConnell went to the Red Roof Inn room, and Yepiz opened the door. According to Detective McConnell, Yepiz produced an I.D. with the name "Rodriguez" on it. During a search of the room, Detective McConnell found two airline tickets for Rodriguez and Espinoza Aranda, as well as a strap that seemed to match the bag found in the Super 8 Motel room. Detective McConnell also discovered on the night stand a wallet apparently belonging to Yepiz. The wallet contained a key to the Super 8 Motel room in which the bag was found.

Mireya Cruz (Mrs. Cruz), Eugenio Cruz's mother, testified that, after her son's death, "[t]he one that was driving" told her that Yepiz murdered her son.[4] According to Mrs. Cruz, Rodriguez asked for her forgiveness, and mentioned that he did not go to the police because he was afraid of "[Yepiz] and his siblings." Mrs. Cruz asked Rodriguez if he would sell her the car because the detectives were asking for evidence. However, Rodriguez told her that he no longer had the car.

The jury acquitted Yepiz of conspiracy to manufacture cocaine base, but found Yepiz guilty on all of the other counts. The district court sentenced Yepiz to life in prison, and Yepiz filed a timely appeal.

## II. *STANDARD OF REVIEW*

Because Yepiz failed to object to the district court's denial of his peremptory challenges, we review for plain error. *See Lindsey*, 634 F.3d at 550. Plain error is error that is plain and that affects the defendant's substantial rights. *See id.* at 551.

---

[4]In her testimony, Mrs. Cruz did not specifically identify Rodriguez as the person who told her that Yepiz murdered her son. However, Rodriguez testified that he told Mrs. Cruz he had not murdered her son. Because the parties do not dispute that Mrs. Cruz was referring to Rodriguez, we utilize Rodriguez's name.

"If these factors are met, relief should be granted only if the error seriously affected the fairness, integrity or public reputation of judicial proceedings. . . ." *Id.* (citation omitted).

## III.  *DISCUSSION*

We consider whether the district court plainly erred by employing its "use it or lose it" voir dire policy practice and determining that Yepiz's acceptance of two jury panels as then constituted resulted in a waiver of two peremptory challenges. According to Yepiz, this involuntary waiver of his peremptory challenges forced him to accept a biased replacement juror.

**[1]** In *Turner*, we considered this exact issue — whether the district court committed reversible error "by treating defense counsel's acceptance of a jury panel as then constituted as a waiver of a peremptory challenge. . . ." *Turner*, 558 F.2d at 536. Due to the district court's adherence to the same "use it or lose it" practice at issue in this case, Turner was not permitted to exercise the allotted peremptory challenges he shared with his co-defendants. *See id.* at 537 ("The district court refused to permit Turner to challenge [the juror] on the ground that he had used all of his peremptories by thrice accepting the jury panel as then constituted."). We explained that "[t]he [voir dire] method chosen by the district court must not unduly restrict the defendant's use of his challenges . . ." *Id.* at 538 (citations omitted). We then noted that the "forced waiver" feature of the "use it or lose it" voir dire practice is "an undue restriction on the exercise of peremptory challenges. . . ." *Id.* We rejected the notion that acceptance of a panel as constituted amounted to the "waiver of a peremptory challenge in respect of a person who was not a member of the panel at the time the jury was accepted." *Id.* (footnote reference omitted). Rather, we opined that once the composition of the panel changes from that previously accepted, "the defendant may exercise any of his unexpended peremptories to excuse the new prospective juror or jurors. . . ." *Id.*

**[2]** Our conclusion in *Turner* is entirely faithful to the plain language of Rule 24 of the Federal Rules of Criminal Procedure. Rule 24 provides that "[e]ach side is *entitled* to the [specified] number of peremptory challenges . . ." Fed. R. Crim. P. 24 (emphasis added). *See Brown v. Dixon*, 891 F.2d 490, 497 n.14 (4th Cir. 1989) ("The peremptory challenge is one means of assuring the selection of a qualified and unbiased jury. The challenge has deep historical roots, and the Court has noted the long and widely held belief that peremptory challenge is a necessary part of trial by jury.") (citation and internal quotation marks omitted).

**[3]** In this case, as in *Turner*, the defense was entitled to ten peremptory challenges, no more, no less. Yet, the district court's "use it or lose it" practice deprived the defendant of the full complement of challenges to which he was entitled under Fed. R. Crim. P. 24. As in *Turner*, equating acceptance of the jury panel at any point in the voir dire process with waiver of a peremptory challenge "unduly restricts" the defendant's use of the peremptory challenges to which he is otherwise entitled. *Turner*, 558 F.2d at 538; *see also Pointer v. United States*, 151 U.S. 396, 408 (1894) (declaring that "[*a*]*ny system* for the impaneling of a jury that prevents or embarrasses the *full, unrestricted* exercise by the accused of [peremptory challenges] must be condemned.") (emphasis added).

In *United States v. Pimentel*, 654 F.2d 538, 541 (9th Cir. 1981), we described as dicta the observation in *Turner* that "a defendant's pass of a peremptory challenge cannot be deemed a waiver of challenges to jurors who have not yet been placed on the panel." (citation omitted). Nevertheless, the facts in *Pimentel* did not require resolution of the issue because the defendant in *Pimentel* "had the opportunity to exercise a peremptory challenge to each juror selected after government strikes. . . ." *Id.* (footnote reference omitted).

**[4]** Dicta or not, our conclusion in *Turner* correctly applied the provisions of Fed. R. Crim. P. 24. We adopt the analysis

of *Turner* and hold that, under the plain language of Rule 24, Yepiz was entitled to exercise ten peremptory challenges. The district court plainly erred in equating Yepiz's acceptance of a jury panel with the waiver of a peremptory challenge to a prospective juror "who was not a member of the panel at the time the jury was accepted." *Turner*, 558 F.2d at 538 (footnote reference omitted). The "use it or lose it" practice deprived Yepiz of his right to contest any prospective jurors seated after the forced waiver of his final peremptory challenge. This deprivation was inconsistent with the express and explicit provisions of Rule 24. *See id.*

**[5]** *Turner* held that automatic reversal was required for an error restricting the use of peremptory challenges, but we have since clarified that the "erroneous denial of a peremptory challenge is not a per se reversible error. . . ." *Lindsey*, 634 F.3d at 550; *see also id.* at 551 (applying plain error review to a peremptory challenge denial). The district court's error in this case was obvious because it was contrary to the plain language of Rule 24. The error affected Yepiz's substantial rights because it deprived Yepiz of peremptory challenges to which he was otherwise entitled. However, under plain error review, we conclude that the district court's error did not "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings. . . ." *Lindsey*, 634 F.3d at 551 (citation omitted). Although Yepiz maintains that the seated juror was biased because of her internship at the District Attorney's office, the record does not support Yepiz's assertion. Notably, Yepiz never expressed any concerns regarding the replacement juror's potential bias. "[W]here as here, no motion was made during jury selection to dismiss the juror in question for cause, [Yepiz] . . . must show that the evidence of partiality before the district court was so indicative of impermissible juror bias that the court was obliged to strike [the juror] from the jury, even though neither counsel made the request. . . ." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (citations omitted). "Actual bias is found where a prospective juror states that he can not be impartial, or expresses a view

adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." *Id.* (citation and internal quotation marks omitted). We have "presumed a challenged juror's bias where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances. We have cautioned, however, that bias should be presumed only in extreme or extraordinary cases. . . ." *Id.* (citations and internal quotation marks omitted).

**[6]** In this case, the juror acknowledged that she had interned for the District Attorney's office while in law school, and that she had worked with her husband in his criminal defense practice. During her internship, she worked on juvenile cases, but was not personally involved in cases involving gang members. The juror stated that her prior experience in the District Attorney's office and with her husband's practice would not affect her impartiality and that she would be able to follow the district court's instructions. As a result, the record does not reflect actual or implied juror bias on the part of the juror. *See id.* at 1154. The lack of evidence of juror bias leads us to conclude that the judicial proceedings were not seriously affected, thereby precluding relief under the plain error standard. *See Lindsey*, 634 F.3d at 551.

## IV.   *CONCLUSION*

The district court plainly erred in requiring the defense to waive a peremptory challenge each time it accepted a jury panel as constituted. The district court should have permitted the defense to exercise the total number of peremptory challenges to which it was entitled, regardless of whether it had previously accepted a jury panel as then constituted. However, under plain error review, reversal of Yepiz's convictions was not warranted, as Yepiz failed to demonstrate that the judicial proceedings were seriously affected by seating of the juror Yepiz challenges on appeal.

**AFFIRMED.**